Brenda Kay LEWELLING, Appellant,

v.

Carl and Melba
LEWELLING, Appellees.

No. 08–89–00105–CV.

Court of Appeals of Texas,
El Paso.

July 19, 1989.

Rehearing Denied Aug. 16, 1989.

Sybil K. Colson, East Texas Legal Services, Paris, for appellant.

J. Brad McCampbell, Alexander & McCampbell, Emory, for appellees.

Before OSBORN, C.J., and WOODARD and KOEHLER, JJ.

## OPINION

KOEHLER, Justice.

This is an appeal from an order in a final divorce decree awarding the managing conservatorship of a minor child to the paternal grandparents. Trial was to the court. We affirm in part and modify in part.

The Appellant, Brenda Kay Lewelling ("Brenda"), and Billy Ray Lewelling ("Bill"), were married on May 16, 1986. Brenda had a six-year-old daughter by a previous marriage and Bill also had children by a prior marriage for whom he was providing no support. They became parents of a child, Jesse James Lewelling ("Jesse"), born on April 1, 1987. The parties separated in August 1987 and Brenda filed for divorce on October 15, 1987. The paternal grandparents, Carl and Melba Lewelling ("Carl and Melba"), filed an intervention seeking to be named both temporary and permanent managing conservators of Jesse. Following a temporary orders hearing, the Texas Department of Human Services was appointed temporary managing conservator of Jesse, resulting in his physical possession being placed by DHS with Brenda during the pendency of the suit. Final hearing was held in March 1988, a number of witnesses testifying for Brenda and for Carl and Melba. At the conclusion of the trial, the court, after finding that "it would not be in the best interest of the child to appoint either of the parents as managing conservator ... [and] ... that the appointment of either of the parents would impair the child's physical health and emotional development[,]" appointed Carl and Melba managing conservators of Jesse. At the request of Brenda, the findings were subsequently formalized in Findings of Fact and Conclusions of Law found in the record.

In her first two points of error, Brenda asserts "insufficiency of the evidence" and "no evidence" to support the trial court's

finding that the appointment of Brenda would significantly impair Jesse's physical health and emotional development. When reviewing a factual sufficiency point, we must consider all of the evidence in the record relevant to the fact being challenged and reverse on that point only if the fact found by the trial court is so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

■ The Texas Family Code provides that a parent is to be appointed sole managing conservator of a child "unless the court finds that appointment of the parent ... would not be in the best interest of the child *because the appointment would significantly impair the child's physical health or emotional development."* [Emphasis added.] Tex.Fam.Code Ann. sec. 14.01(b) (Vernon Supp.1989). The latter emphasized clause was added by the 70th Legislature, effective September 1, 1987. The natural right to maintain the parent/child relationship is one of constitutional proportions and should be disturbed only for the most compelling and serious reasons. *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976); *Neely v. Neely,* 698 S.W.2d 758, 759 (Tex.App.—Austin 1985, no writ). The courts have always recognized the strong presumption that a child's best interest is usually served by keeping custody with the natural parents. *Wiley v. Spratlan,* 543 S.W.2d at 352. The party seeking to avoid the presumption's effects must first produce evidence to overcome it. *Neely v. Neely,* 698 S.W.2d at 759. When sufficient evidence contrary to the presumed fact is introduced, the presumption vanishes and the situation is the same as it would have been had no presumption existed. *Allred v. Harris County Child Welfare Unit,* 615 S.W.2d 803 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Since the intervenors in this case had the burden to prove by a preponderance of the evidence that the appointment of Brenda would not be in the best interest of Jesse because the appointment would significantly impair the child's physical health or emotional development, Tex.Fam.Code Ann.

sec. 11.15(a) (Vernon 1986), they had to do more than just rebut the presumption.

■ In the final divorce hearing, there was evidence Brenda had been physically abused by her husband during much of their marriage, and that he would take Jesse to his parents, Carl and Melba, when he and Brenda were fighting. According to Brenda, Carl and Melba were not only aware of the abuse but they had witnessed it on occasion. Carl and Melba admitted they had been told by Brenda about the abuse, had seen bruises on her, but denied seeing Bill hit her. Brenda testified that she had gone to the women's shelter on three occasions, once when she was pregnant with Jesse, and had been taken to the hospital for head injuries on one occasion. She testified that although she was scared and terrified of her husband, she would drop charges and go back to him after each occasion. On the last incident of violence that lead to their separation, Bill took Jesse against Brenda's will to his parents where the child remained for two months. During that period, she did not see Jesse but, according to her, did make one unsuccessful attempt to get help from the Department of Human Services and the sheriff. The testimony is conflicting as to whether she made any request to or demand on her mother-in-law to see Jesse. From the time he was born, Carl and Melba had physical possession of Jesse for a number of periods ranging from a week or so to two months.

Brenda admitted on cross-examination that remaining with her husband created a bad environment for her children. Despite her fear, she continued seeing Bill after their separation and during the pendency of the divorce, when he came to visit Jesse, and admitted to riding with Bill in his car and seeing him in public when there were people around. She testified that if Bill would get counseling, she might consider going back into the marriage with him. Brenda testified that she had been committed to Terrell State Hospital on two occasions, the first time on a voluntary commitment for two weeks "to see if there really was something wrong with me[,]" and most recently, by her father-in-law and husband,

"... without a hearing. They released me. They kept me twenty-four hours."

On the subject of environment and means of support, there was testimony that Brenda was currently living with her seventy-three-year-old mother, her sister, Imogene, and Imogene's twenty-year-old retarded son, Brenda's six-year-old daughter, Tiffany, and Jesse, in a three-bedroom house, owned by another sister, under "slightly" crowded conditions, and would continue to live there after the divorce. It appears that Brenda and Imogene did not get along well and on one occasion, Imogene made Brenda and her children leave for a couple of days. The health of the mother was variously described as very poor or healthy. Imogene was taking medication for her nerves. Brenda's only income was $158.00 per month AFDC, which she received for Tiffany, and WIC aid (baby cereal and formula, diapers and other items for the children). Brenda's mother was receiving social security payments as was Imogene for her retarded son. Brenda was neither employed nor trained for employment. Although she had been advised to seek job training, available at the courthouse or through the Texas Employment Commission, Brenda had made little or no effort to get that kind of help but was planning to do so after the divorce. No one else in the household was employed at the time.

Of the two Department of Human Services' employees who were assigned to the case, the one who did the social study on Brenda recommended that she be appointed managing conservator, and the other, who did a similar study on Carl and Melba, recommended that Jesse be placed with them.

We conclude that there was ample conflicting evidence from which the trial court could reach a conclusion. We cannot say that the court's findings, that the appointment of Brenda was not at that time in the best interest of the minor child and that her appointment would significantly impair the child's physical health and emotional development, were so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d at 176. This Court is not a fact finder and thus, cannot pass upon the credibility of witnesses or substitute its judgment for that of the trier of fact, even if a different conclusion could be reached on the conflicting evidence. *Clancy v. Zale Corporation,* 705 S.W.2d 820, 826 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). Since we have concluded that there was sufficient evidence to support the court's findings, Points of Error Nos. One and Two are overruled.

■ In Point of Error No. Three, Brenda complains that the trial court erred in applying a "preponderance of the evidence" standard, rather than a "clear and convincing proof" standard as required by the due process clause of the United States Constitution and Article I, Section 19, of the Texas Constitution.

Brenda argues that awarding managing conservatorship to a non-parent is tantamount to a termination of parental rights, and, as such, requires application of the clear and convincing standard. Tex.Fam. Code Ann. sec. 11.15(a) and (b) (Vernon 1986) provides that findings in suits affecting the parent-child relationship, except in termination cases where findings terminating the parent-child relationship must be based on clear and convincing evidence, are to be based on a preponderance of the evidence, as in other civil cases. Brenda cites *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) and *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), in support of her argument that due process requires application of the clear and convincing standard in this case. However, both of those cases involve termination of a parent's rights. Awarding managing conservatorship to a non-parent does not result in termination of parental rights anymore than awarding managing conservatorship to one parent terminates the rights of the possessory parent. Brenda was appointed possessory conservator with specific visitation rights. There is nothing to prevent her from seeking a modification of her status in the future. The

application of the preponderance of the evidence standard to conservatorship findings in suits affecting the parent-child relationship does not deny the parent due process. *Choyce v. Dallas County Child Welfare Unit*, 642 S.W.2d 559 (Tex.App.—Dallas 1982, no writ). The language added to Section 14.01(b), set forth earlier in this opinion, did not change the standard of proof. It did make the existing presumption stronger in the sense that the non-parent must now come forward with sufficient probative evidence tending to show not just that it would be in the best interest of the child, but would be in his best interest because the appointment of the parent would significantly impair the child's physical health or emotional development. Point of Error No. Three is overruled.

■ In her final point, Brenda contends that the trial court erred in refusing to allow her to prosecute this appeal pursuant to her affidavit of inability to pay costs. Rule 40(a)(3)(B) of the Texas Rules of Appellate Procedure provides that after the appellant files an affidavit of inability to pay the costs of an appeal, he must give notice to the opposing attorney and the court reporter within two days after the filing; otherwise, he may not prosecute his appeal without paying costs. The record shows that the temporary hearing was held in Van Zandt County. The final hearing was commenced in Van Zandt County and completed in Hunt County, both counties comprising a part of the 196th Judicial District. The final divorce decree was signed on April 4, 1988. On April 12, 1988, Brenda requested, by letter, that the court reporter in Van Zandt County prepare a statement of facts. After being advised of the cost of the record, Brenda by copy of letter dated April 20, notified the reporter that she would be filing a pauper's oath. Although it was dated April 22, the affidavit was filed on April 25, 1988. Notices of contest were filed by the reporter on April 26 on the grounds that proper notice had not been given as required by Tex.R.App.P. 40(a)(3)(B), and by intervenors on April 27, 1988, on the grounds that Brenda was not indigent. After a hearing, the trial judge sustained the contests and ordered that

Brenda file a cost bond, the judge stating on the record, but not in his order, that Brenda had failed to give the required notice to the court reporter within two days after filing her affidavit of inability. A cost bond was then filed by Brenda's attorney.

■ Provisions relating to indigency, like other appellate rules, have long been liberally construed in favor of the right to appeal. *Jones v. Stayman*, 747 S.W.2d 369 (Tex.1987). Although the reporter did not receive formal notice within two days after the filing of the affidavit, she knew shortly after April 20 that Brenda intended to file the affidavit and must have known that the affidavit had been filed before April 26, the day the reporter filed her contest. As stated by the Supreme Court in a per curiam opinion in *Jones v. Stayman*, 747 S.W.2d at 370: "The notice requirement in Rule 40(a)(3)(B) was intended to allow the court reporter and the appellee the opportunity to file a timely written contest." Since the reporter and Appellees did file their contests well within the ten day period prescribed under Rule 40(a)(3)(C), the reason for the rule was satisfied. Since the uncontradicted evidence showed that Brenda had no income other than $158.00 per month AFDC, we hold, as a matter of law, that she was indigent and therefore entitled to prosecute the appeal without paying costs or giving security therefor. The fourth point of error is sustained.

The judgment of the trial court is affirmed in part with respect to Points of Error Nos. One, Two and Three. Having sustained Point of Error No. Four, we modify the judgment of the trial court with respect to costs and order that the Appellant be allowed to proceed without paying costs or giving security for such costs.